EFFIE E. THOMPSON, ADMINISTRATRIX, v. MISSOURI PACIFIC RAILWAY COMPANY.

FILED MAY 5, 1897.    No. 7256.

</div>

1. **Nonsuit: DIRECTING VERDICT.** Under our Code a trial court has no authority to enter an involuntary nonsuit and judgment of dismissal because the plaintiff by his evidence fails to establish his cause of action. In such case the proper practice is to instruct the jury to return a verdict for the defendant. But where the evidence entitles the defendant to have a verdict so directed, it is error without prejudice to the plaintiff to enter the nonsuit. (*Zittle v. Schlesinger*, 46 Neb., 844, followed.

2. **Master and Servant: DEFECTIVE APPLIANCES: RISKS OF EMPLOYMENT.** If the machinery, tools, or appliances furnished a servant by his master are obviously defective and dangerous, and the servant, notwithstanding, continues in the service, he thereby assumes the risks of any injury which he may sustain by reason of such defective appliances. *Missouri P. R. Co. v. Baxter*, 42 Neb., 793, followed.

3. ——: ——: ——. While there are certain exceptions to this general rule they do not apply to a case where a brakeman is injured by a defective coupling on a car which he has habitually handled for a long period of time with knowledge of the defect and without protest on his part or promise to repair on the part of his master.

4. **Railroad Companies: COUPLERS.** The act requiring railway companies to equip their cars with automatic couplers (Session Laws, 1891, ch. 19) permitted railway companies to use cars not so equipped until January 1, 1895, and prior to that it forbade only the originally putting in use in this state of a new car not so equipped, or of a car which had been in the shops for general repairs or for repairs necessitating a new drawbar, after the passage of the act.

5. ———: Death of Brakeman: Negligence in Constructing Car: Question for Jury. The evidence tended to show that plaintiff's intestate, a brakeman, undertook to couple a freight car equipped with link and pin coupler to a coach equipped with a Miller hook; the coupling bars slipped by one another leaving a space of about twelve inches between the ends of the cars; that there was on the freight car a bolt projecting several inches from the end of the car and beyond the end of the nut. Plaintiff's intestate was killed by the collision. The only wounds due immediately to the collision were a bruise over the heart the size of a silver dollar, and a smaller bruise on the back opposite the first. The bolt was so situated that as he stood between the cars it would strike him about where the wound was found. *Held*, That the case should have been submitted to the jury on the question of negligence in the construction of the car with reference to the bolt and as to this being the proximate cause of his death, the car not being one with which he was familiar, and it not being shown that such a construction was common among the cars he habitually handled.

Error from the district court of Cass county. Tried below before Chapman, J. *Reversed.*

*Matthew Gering,* for plaintiff in error.

*B. P. Waggener, James W. Orr,* and *A. N. Sullivan, contra.*

Irvine, C.

This was an action under Lord Campbell's act by Effie E. Thompson, as administratrix of the estate of Amos Thompson, deceased, to recover from the Missouri Pacific Railway Company on account of the death of her intestate, alleged to have been caused by the negligence of the defendant. Issues were joined and a trial to a jury begun. When the plaintiff rested, the court, on defendant's motion, granted what is frequently, but somewhat loosely, styled an "involuntary nonsuit," by discharging the jury from further consideration of the case and then entering an order of dismissal. To reverse this the plaintiff brings the case here by proceedings in error.

The order discharging the jury because of the insufficiency of plaintiff's evidence, and dismissing the case, was erroneous. Since the trial of the case in the district

court this court has had occasion to consider the pro-
priety of the procedure resorted to, and it has been held
that under our Code a trial court has no authority to
enter an involuntary nonsuit and judgment of dismissal
because the plaintiff by his evidence fails to establish
his cause of action.   In such case the proper practice is
to instruct the jury to return a verdict for the defendant.
(*Zittle v. Schlesinger*, 46 Neb., 844.)   But in that case it
was also held that a judgment so entered is error without
prejudice to the plaintiff, when the evidence was of such
a character that the court should have directed the jury
to return a verdict for the defendant.   We are, therefore,
required to examine the evidence in the case before us
and ascertain whether it should have been submitted to
the jury.   If so, the judgment must be reversed.

Amos Thompson, a man thirty-four years of age, of
sound health and normal mental faculties, was in Feb-
ruary, 1892, employed as a brakeman by the railway
company.   He had previously had one year's experience
as a brakeman on another railway.   On the 28th of Octo-
ber, 1892, he was killed while making a coupling at Union,
Nebraska.   He was at the time, and had for some months
been, regularly engaged in assisting to operate a freight
train running between Union and Omaha.   This train
regularly carried a car for the conveyance of passengers,
described by one witness as a "Missouri Pacific standard
coach," but elsewhere referred to as a "combination car."
It was provided with what is known as a Miller coupler,
being the hook-like device usually found on passenger
trains.   It would seem that this coupling apparatus was
defective, or else that in its construction it is not adapted
to coupling to the ordinary link and pin draw-bar com-
monly in use on freight cars, because in making coup-
lings it quite frequently "slipped by," as the witnesses
say, that is, the Miller hook on this car failed to meet
the draw-bar of other cars, but passed to one side, thus
preventing a coupling and crowding the cars more closely
together than is proper.   One witness says that it had

38

slipped by one hundred times, and the evidence is uncontradicted that several times it had so slipped by when Thompson was making a coupling, and that he for a long time had been fully aware of its defective character. There is no evidence of any complaint made by him on this matter, or any promise on the part of the company to remedy the defect. There is also evidence tending to show that a metallic guard, designed to hold the coupler up to its proper position, had become loose, and that the hook was thereby permitted to drop a short distance below its normal position. This, also, was a defect as apparent to Thompson as to any other employe; perhaps more so, as his duties required him constantly to handle the coupler. On the day of the accident the train had been separated at a highway crossing at Union, the passenger coach standing to the south side of the highway and the remainder of the train to the north. Thompson, acting under directions from the conductor of the train, signalled the engineer to back the train to the coach, and as the cars approached he stepped between them to make the coupling. The car to which it became necessary to couple the coach was a Missouri Pacific freight car, provided with the ordinary link and pin coupler. The couplers failed to connect, the cars were forced together, Thompson was caught between them and instantly, or almost instantly, killed. So far as we have stated the evidence, we think it tends in nowise to disclose a cause of action. It falls clearly within the rule that if the machinery, tools, or appliances furnished a servant by his master are obviously defective and dangerous, and the servant, notwithstanding, continues in the service, he thereby assumes the risks of any injury which he may sustain by reason of such defective appliances. (*Missouri P. R. Co. v. Baxter*, 42 Neb., 793; *Dehning v. Detroit Bridge & Iron Works*, 46 Neb., 556; *Malm v. Thelin*, 47 Neb., 686; *Chicago, B. & Q. R. Co. v. McGinnis*, 49 Neb., 649.) Nor is there any evidence bringing the case within any of the exceptions to this rule. The defect was well known to

Thompson, and similar accidents had several times occurred within his observation. It must be taken that the risk was one which he had assumed.

A strenuous effort was made by counsel for the plaintiff to show that the Miller hook slipped by, not laterally, but below the draw-bar. From this postulate it is argued, in the first place, that the accident was caused, not by the generally defective character of the hook, but by the looseness of the metal guard; and secondly, that, slipping under, the cars were brought much nearer together than would have been the case had it slipped by laterally, because in the latter case the first contact would be between the end of the hook and the dead-head of the front car, which would leave a space of about twelve inches free. As already indicated, the defect in the guard was also an obvious defect, at least as open to Thompson's observation as to that of any other person, and in the next place, the evidence wholly fails to sustain the theory that the hook slipped under. All the witnesses testify to dinges on the dead-heads or bumpers of the cars, so situated that the evidence discloses nothing which could have caused them except a lateral slipping-by of the couplers. Moreover, the only injuries observed on the upper part of Thompson's body were two small bruises, one upon his chest, the other upon his back; and had the hook slipped under the draw-bar, the evidence as to the condition of the cars shows that they would have come so much nearer together that a further and more extended crushing of Thompson's body would almost inevitably have taken place. This circumstance is of great importance in the consideration of another feature of the case. We think that so far as the plaintiff rested her case upon the condition of the couplers, it was wholly without merit.

It was also pleaded that the cars had been generally repaired subsequent to the 1st day of August, 1891, and not provided with automatic couplers as required by the act of the legislature which went into effect July 9, 1891. (Session Laws, 1891, ch. 19.) This theory is casually re-

ferred to in the briefs. It is stated by the defendant in error that it was disclaimed in open court before the trial began; but the record does not show this. There is some evidence tending to show that the front car was constructed after the time referred to. However, we do not see how the plaintiff can claim anything under this act. The act, by its first section, provides that it shall be unlawful to put into use in this state any new cars, or cars that have been sent into the shop for general repairs or whose draft rigging has to be repaired, that are not equipped with safety or automatic couplers or draw-bars, etc. By the second section it is provided that after January 1, 1895, it shall be unlawful for any corporation operating a railroad "to have upon any railroad in Nebraska for use in transportation of freight or passengers" any car not so equipped. Taking these two sections together, it is found that the object of the first section was to prohibit, from the time the act took effect, the putting in use in this state of new cars or newly repaired cars not so equipped; but, by the second section, cars not so equipped might be used in the state until January 1, 1895, which was after the accident. The distinction made in the two sections between using a car and putting it in use indicates that the language of the first section is confined to originating the use of a car. Until January 1, 1895, the company might use cars in this state not so equipped, but could not for the first time in this state send out for use such a car. When considered in connection with the acts of congress on the subject, there was an obvious reason for this distinction. There is no evidence that the car in question was put into use in this state contrary to the statute. These remarks are made wholly with reference to the construction of the statute, and without considering the questions raised as to its validity in view of the federal powers over interstate commerce and the acts of congress on the subject.

It is also alleged that the track at the point referred to was defective because of improper ballast; but there

is no evidence to show that the method of ballasting employed was improper, or that it increased the hazard to employes; nor is it shown that the accident to Thompson was caused or contributed to in any way by the condition of the track.

Finally, it was alleged that the freight car was defectively constructed, by reason of a bolt of unusual length which projected from the end of the car, and which, it is alleged, struck Thompson and caused his death. Several witnesses testify to the existence of this bolt. Their testimony places it at such a point on the end of the car that it might strike a person standing as Thompson did to make the coupling. One witness says that it extended out the width of four or five burrs, and perhaps more than half an inch from the burr. This leaves it a little uncertain as to whether there were four or five burrs on the bolt and a projection of half an inch beyond the outer one, or whether the latter statement was intended to limit and correct the former. Another witness says that he measured the bolt, and it was four and a half inches long and extended about half an inch from the end. How the rest of the space was occupied does not appear. Another witness grasped the bolt with his hands, and by that method estimated that it projected an inch and a half to two inches from the end of the nut. We have already mentioned the wounds found on Thompson's body. His legs were somewhat injured, presumably from being dragged along the track after the cars struck. The only other marks or injuries discovered were two small bruises,—one in front, about over the heart and about the size of a silver dollar; the other a smaller bruise on the back, almost opposite the first. The witnesses who observed the bolt testify as to its location in such a way as to justify a fair inference that the bruise over the heart was caused by the end of this bolt. As already stated, if the Miller hook slipped by laterally it would strike the dead-head of the front car in such a way as to leave a space of about twelve inches where Thompson was stand-

ing.   Thompson was five feet eight inches high, and weighed 150 pounds.   A man of this size standing between the cars might, under the circumstances, have escaped injury, or at least serious injury; but if the bolt projected as far as some witnesses say it projected beyond the nut, the fatal result might have been due to the bolt alone.   We think in this aspect of the case, and this only, there was evidence which should have gone to the jury as justifying an inference that the construction of the car with the bolt so projecting was a negligent construction, and the proximate cause of Thompson's death.   This car was not one habitually used by him, and there is nothing to show that he had ever seen it before or had any knowledge of its condition.   There is nothing to show that such a method of construction was common to the cars hauled on defendant's road.   It was not such an obvious and apparent source of danger that Thompson's undertaking once to handle the car operated as an assumption of the risk on his part.

REVERSED AND REMANDED.